# CASES

# APPELLATE COURTS OF ILLINOIS.

23  531
137s   9
23  531
45  465

---

## FIRST DISTRICT—MARCH TERM, 1887.

---

### THE ILLINOIS CENTRAL RAILROAD COMPANY
### V.
### BALTIMORE & OHIO & CHICAGO RAILROAD COMPANY.

*Landlord and Tenant—Forcible Entry and Detainer—Only Strict Legal Rights Enforcible—Termination of Lease—Estoppel in Pais—Election—Contract under Seal—Parol Agreement.*

1. In an action of forcible entry and detainer the court can not look to the equities of the parties but must enforce their strict legal rights.

2. An estoppel *in pais* affecting permanent interests in land can only be made available in this State in a court of equity.

3. An executory contract under seal can not be modified or varied by a parol agreement.

4. Where, by an instrument under seal, a party thereto is given the right to elect to lease freight grounds in perpetuity, such right of election being confined to a certain definite territory, said instrument can not be altered by parol so as to extend the right of election to other and different territory.

[Opinion filed July 13, 1887.]

APPEAL from the Superior Court of Cook County; the Hon. KIRK HAWES, Judge, presiding.

An action of forcible entry and detainer was commenced by the appellant against the appellee, to recover possession of cer-

(531)

tain ground known as freight station grounds and particularly
described in the complaint.

On a trial before the court without a jury the finding and
judgment was for appellee, and such judgment is brought to
this court for review.

It appears, from the record, that in 1874, appellee, being
desirous of obtaining entry for its trains into Chicago, and
freight and passenger accommodations in the city, entered into
an agreement with appellant, which arrangement is evidenced by
a lease of the premises in controversy from appellant to appellee,
bearing date the 27th day of July, 1874, and a contract of the
same date, and which was executed between the parties at the
same time. These instruments refer to each other, and so far
as they contain provisions relating to the subject-matter in
controversy, they are to be read together and construed as if
they constituted but one instrument. By the lease the appel-
lant leases to the appellee from date of lease till the first
day of November, 1879, ground in City of Chicago (describing
it), in consideration of which appellee is to pay appellant,
within fifteen days from the expiration of each month, dur-
ing the lease and any extension thereof, the sum of $1,820,
possession of ground to be delivered about September 1,
1874, and rent to commence when possession given. At
the expiration of the lease the first party will take freight
house, then upon said ground, at its value, to be ascertained by
appraisal, and said first party may, at its option, have the tracks
and other improvements upon the ground at the expiration of
the lease at an appraisal of their then value; appraisal to be
made by arbitrators, each party selecting one, and in case of a
disagreement, they to select an umpire.

If the first party does not elect to take said improvements
other than the freight house, second party may remove same
before expiration of lease. The lease then contains the fol-
lowing clause, which is material in the present controversy:
" It is further expressly agreed between the parties hereto
that if the second party elects to lease freight station grounds
in perpetuity of the first party, as specified in certain articles
of agreement between said parties, bearing date the twenty

seventh day of July, 1874, and shall give notice to the first party as therein provided, then the first party agrees to extend this lease to a further term, on the same condition, or furnish the second party a lease of other as suitable ground for its freight business, upon terms to be agreed upon, until the first party delivers to the second party the possession of the ground so leased in perpetuity, or is prevented from so doing as specified in said articles of agreement." The contract or articles of agreement referred to, leases to the second party (appellee) the right to run its cars, engines and trains for the transaction of the business of the said party of the second part over that portion of the Illinois Central Railroad extending from the junction of the two roads at or near Hyde Park to the north line of Randolph Street extended, in Chicago, for passenger trains, and for freight trains from said junction to the south line of said depot grounds this day leased by the said party of the first part to the said party of the second part. And the said party of the second part is to have the use of such tracks upon that part of the railroad of said party of the first part as may be agreed upon, for running over its road the trains, cars and engines of said party of the second part under the rules and regulations of said party of the first part, for and during the term of five years, from the first day of November, 1874. And the said party of the second part shall have the above mentioned right to run its cars, engines and trains under the obligations herein expressed in perpetuity, if within said term of five years it shall so elect, and shall also elect to lease the freight station grounds, hereinafter named, of the first party in perpetuity, and shall notify said party of the first part of such election in writing. It being understood by the parties hereto that said freight cars shall be run after the expiration of said term of five years over the track of the Illinois Central Railroad only as far north as the south line of ground hereinafter to be leased to said party of the second part. And the said party of the second part hereby covenants to and with said party of the first part to pay monthly for and during the term of five years above mentioned, and for and during the extended term (if such election shall be made as above

provided) for the right and use above mentioned, upon all the traffic, etc." Then follows a scale of charges to be paid by the second party to the first party upon passenger, freight, etc. The other clauses of the contract material to be considered are as follows: "Should the second party elect to lease permanent freight grounds upon the lake front, the first party agrees to enclose and fill the same ready for occupancy to an extent and in a manner to be agreed upon between the parties. If the first party shall be prevented by legal proceedings from enclosing and filling said grounds before November the first, eighteen hundred and seventy-nine, then the arrangement herein between the parties shall be continued for another term of five years, or for such portion thereof as may be necessary to enable the party of the first part to obtain legal title to and to enclose and fill the ground aforesaid. Should the party of the first part be unable to secure legal title before the expiration of three years from November the first, eighteen hundred and seventy-nine, or should the second party be unable to obtain convenient and proper access to said permanent freight grounds, then in either case the party of the second part shall have the right to select other freight grounds not owned or claimed by the Illinois Central Railroad Company.

"The second party agrees not to attempt to acquire from any other source than by contract with the Illinois Central Railroad Company any title of right of possession in the submerged or other lands that may be claimed by the first party between Hyde Park Junction and Randolph Street extended, and any such attempt shall work a forfeiture of all rights under the contract. * * * And the said second party agrees to pay therefor seven per cent. interest upon one dollar and fifty cents per superficial foot for lease in perpetuity, with the right to pay the gross sum in full at the option of the said party of the second part. * * *

"If the second party elects to lease the above mentioned freight grounds on the lake front in perpetuity, then the first party will furnish it a site for an engine house of ten stalls for the same time upon equitable terms.

"The said party of the first part hereby gives its consent that

said party of the second part shall be allowed an interest in the proposed new passenger station if said party of the second part so desires, either as joint owner or upon a fair rental, as may be agreed upon between the parties in interest.   And the said party of the first part hereby agrees to give said party of the second part the right to use its undivided interest in the Chicago passenger station and the stations between Chicago and the junction at Hyde Park for a reasonable compensation.   *   *   *

"In case of any disagreement as to the valuation rentals, ground rents, extensions of shore line, or filling in, or other things that are to be agreed upon by the parties, or in case of any disagreement as to the terms of the contract or the several things that are to be done by the parties hereto, the matters in difference are to be referred to arbitrators, one to be chosen by each company, and upon their failing to agree they are to appoint an umpire."

Under the said lease and contract the appellee took possession of the premises and operated its passenger and freight business, paying to appellant rent in accordance with the terms of the lease for the freight stations, and in accordance with the contract for the right to run its cars, etc., for carrying on its traffic to and from Chicago, and continued to pay until the commencement of this suit.

In the fall of 1879, before the expiration of the first term of five years provided in the lease, a Mr. Keyser, who represented the appellee, came to Chicago for the purpose of looking into the subject of permanent freight depot grounds, and, after examining the situation from maps and familiarizing himself with the location, went in company with the president and general superintendent of the appellant company upon certain ground situate north of Randolph Street and east of the freight station then occupied by appellee under the lease, which ground appellant offered to appellee for a permanent freight station.

In the negotiations between the representatives of the two companies as to these permanent freight grounds it was stated that appellant could not furnish ground south of Randolph

Street owing to legal difficulties and complications. The proposed new freight ground was measured, a tracing or outline furnished to Keyser, the shape of the grounds discussed and a rental agreed upon at the rate of $24,000 per year, the basis of such rental being seven per cent. interest on a valuation of $2 per foot.

After the ground had been mutually agreed upon, the rental fixed and some other terms of the lease to be made indeterminately discussed, nothing further was done till on October 23, 1879, some two days before the expiration of the time limited in the lease and contract for making an election to lease freight station grounds in perpetuity, Mr. Keyser, general manager for the appellee, sent the following letter to the president of the appellant company.

" WHEELING, W. VA., Oct. 23, 1879.

" W. K. ACKERMAN, Esq., President Illinois Central R. R. Co.

"*Dear Sir:*—Under the contract dated July 27, 1874, between the Baltimore, Pittsburgh & Chicago Railway Company, Illinois Division, (whose corporate name now is the Baltimore & Ohio & Chicago Railroad Company), and the Illinois Central Railroad Company, the former company has elected to run its cars, engines and trains in perpetuity, under the obligations expressed in said contract.

"It has also elected to lease the freight station ground in perpetuity, and gives this notice accordingly. I have had our counsel draft the form of a lease or contract between the two companies, in which the description of the freight grounds is left blank, awaiting the report of your engineer. I enclose the form for your examination. Please let me know whether any amendments or modifications are needed in it.

"I believe it embodies the suggestions made by both of us when I last saw you in Chicago. Yours respectfully,

" WM. KEYSER,

Gen. Manager Balto. & Ohio & Chicago Railway Co.

"P. S.—Since writing this, I have been advised that the description is ready, and I have therefore requested our counsel to embody it in the lease before presenting same to you."

The letter was accompanied by the draft of lease, which draft contained a description of the land shown to Keyser by the officers of the Illinois Central Company lying north of Randolph Street.

The letter together with the draft were delivered to the solicitor and to the general superintendent of the appellant company on October 29, 1879, Mr. Ackerman, the president, being away; and on October 31, 1879, the superintendent of the appellee company called upon Mr. Ackerman and asked him if he had received the letter of Mr. Keyser, and he said he had; that it was a notice of the election of the Baltimore & Ohio & Chicago Railroad Company to run its trains and occupy the freight grounds in perpetuity, and that it was all right.

The draft of lease submitted by the Baltimore Company was not satisfactory to the Illinois Central Company, and a counter-draft was prepared by the solicitor of the last named company, which was submitted to appellee.

The terms and provisions of the draft and counter-draft were essentially different, and there was no agreement reached between the companies on the points of difference. Several letters having reference to the completion of the contract or lease for proposed freight station grounds passed between the officers of the respective companies at intervals from the fall of 1879 till April, 1883, and some interviews were had during said period between representatives of the companies in which the subject of the pending lease or contract, and the obstacles in the way of closing it up, were, it would appear, to some extent discussed, but no definite understanding was ever reached.

On March 12, 1883, the following was addressed by the president of the Illinois Central Company to John W. Garrett, president of the Baltimore & Ohio Railroad Company:

"*My dear Sir:*—When last I had the pleasure of meeting you in Baltimore, I called your attention to desirability of securing for your Co. a piece of land in the City of Chicago, for freight purposes, being east of your present freight house, the understanding being that we were to purchase your present

building at an appraised valuation. The Michigan Central R. R. Co. are very anxious to secure additional facilities here, and would, I think, be glad to take the piece of ground which we had rather reserved for your Co. If you do not desire to lease it, however, will you please advise me definitely, so that I can treat with the other Co.

"If I do not hear from you by the 1st of April, I will assume that you do not care to take the grounds offered.

"Yours very truly,

"W. K. ACKERMAN, Prest."

To which letter the following reply was sent, dated March 29, 1883:

"W. K. ACKERMAN, Esq.:—Prest. I. C. R. R. Co.

"*Dear Sir:*—I have received from president Garrett of the B. & O. R. R. Co., your letter of the 12th inst. addressed to him concerning the permanent freight grounds for the B. & O. & C. R. R. Co., at the City of Chicago. This company will accept as freight grounds those referred to in that letter upon the terms of the contract of July 12, 1874.

"Yours very respectfully,

"B. DUNHAM,

"President B. & O. & C. R. R. Co."

This letter was answered April 2, 1883, as follows:

"B. DUNHAM, Esq.:—President B. & O. & C. R. R. Co.

"*Dear Sir:*—Your favor of the 29th inst. was duly received. I supposed it was well understood that if your company desires to lease the ground referred to in my letter to Mr. Garrett of the 12th of March last, it must be made the subject of an independent agreement. Terms were nearly concluded with Mr. Keyser three or four years ago, and, if agreeable to your company, we should be willing to resume the negotiations where he left them; but for the reason stated in my letter to Mr. Garrett immediate action is desirable.

"Yours truly,

"W. K. ACKERMAN, Prest."

There was no reply to this letter and no further negotiations on that subject.

All the facts relating to the controversy as to title and possession of the submerged land south of Randolph Street were communicated to the representatives of the B. & O. & C. Co. during the negotiations leading up to the contract and lease of July 27, 1874, as fully as such facts were known to the officials of the Illinois Central Co. It was proved at the trial that the term "lake front" had acquired in 1874 a precise and definite meaning and was used to designate the space between Randolph Street and Park Row east of Michigan Avenue, including the public ground and the submerged land in front of it. Other facts sufficiently appear in the opinion.

Messrs. B. F. Ayer, W. C. Goudy and John M. Hamilton, for appellant.

It was competent for the appellant to permit the appellee to hold over after the expiration of the term; but, if the appellee did not elect to lease freight station grounds in perpetuity "as specified in the articles of agreement" and give notice as therein provided, the appellant was not obliged to extend the term. It might have refused to prolong the tenancy. And if, under those circumstances, the tenancy was allowed to continue by the mere acquiescence of the lessor, without any new agreement between the parties, the only rights acquired by the lessee would be those of a tenant from year to year. No length of occupation by a tenant so holding in subordination to the estate of the lessor, would give him any greater rights than those of a tenant from year to year. Clinton Wire Cloth Co. v. Gardner, 99 Ill. 151; Pricket v. Ritter, 16 Ill. 96.

An agreement to make and accept a lease of other grounds than those specified in the article of agreement of July 27, 1874, even if such an agreement had been in fact made, would not, of itself, entitle the appellee to an extension of the original lease.

The stipulation on that subject in the original lease is, that if the second party shall elect to lease freight station grounds in perpetuity of the first party, as specified in the articles of agreement, and shall give notice as therein provided, then the first party shall extend the original lease for a further term,

on the same conditions, until the first party delivers to the second party the possession of the ground so leased in perpetuity, or is prevented from so doing as specified in said articles, of agreement. The obligation to extend the term was dependent on the performance by the lessee of a condition precedent, viz.: that before the term expired it should lease certain other grounds of the lessor, which were particularly specified, in perpetuity. An agreement to lease grounds different from those thus specified would not be a performance of that condition. It is clear, therefore, that such an agreement would not carry with it to the lessee the legal right to demand an extension of the original term, unless it was accompanied by a stipulation modifying the condition of the lease.

Was there any such stipulation? To be valid, an agreement to alter the terms of a sealed instrument must be itself under seal. The lease of July 27, 1874, was attested by the corporate seals of the two companies; and, under the common law rule established in this State, the terms of such an instrument can not be enlarged or varied by a subsequent parol agreement. Loach v. Farnum, 90 Ill. 368; Barnett v. Barnes, 73 Ill. 216; Wittmer v. Ellison, 72 Ill. 301; Hume v. Taylor, 63 Ill. 43; Chapman v. McGrew, 20 Ill. 101; Stein v. Jones, 18 Ill. App. 543.

Under the rule established in this State, estoppels *in pais*, affecting interests in land, can be enforced only in a court of equity. St. Louis Nat. Stock Yards v. Wiggins Ferry Co., 102 Ill. 514.


Messrs. GEORGE W. SMITH, JOHN N. JEWETT, JOHN K. Cowen and C. C. CLARKE, for appellee.

The contract and lease concerned a railroad and its operation. This is a peculiar species of property. P. & S. R. R. Co. v. Thompson, 103 Ill. 187; Turner v. R. W. Co., 8 Biss. 380; Meyer v. Johnston, 53 Ala. 237, 357.

A clause in the contract, binding the Illinois Central Railroad Company to furnish the Baltimore, Pittsburg & Chicago Railway Company "freight station grounds" should be upheld, although such grounds might not be located or

described. Storer v. G. W. R. Co., 2 Younge & C. 48, to construct archway; Greene v. W. C. R. W. Co., L. R. 13 Eq. 44, to construct siding; Laird v. Birkenhead R. W. Co., Johns. Eng. Ch. 500, private branch line, terms and details left open, railroad company bound to come to reasonable terms; Wilson v. Furness R. W. Co., L. R. 9 Eq. 28, approving Storer v. G. W. R. R. Co., *supra*, to make carriage road and wharf; Llannelly L. & D. Co. v. L. & N. W. R. Co., L. R. 7 E. & I. App. 551, running arrangements; G. N. R. W. Co. v. M. L. & L. R. W. Co., 5 De G. & Smale, 138, contracts for use of railways not licenses at will, but permanent; G. N. R. W. Co. v. E. C. R. W. Co., 9 Hare, 306, running contracts construed; Wilson v. N. & B. J. R. W. Co., L. R. 9 Ch. App. 279; Dorsey v. St. L., A. & T. H. R. R. Co., 58 Ill. 65, agreement to construct good and suitable fences, cattle guards and crossings at such places as Dorsey should designate; Chedester v. S. & I. S. R. R., 59 Ill. 87, bond to convey, construed to mean three and a half acres on either side of track, as company should determine to locate it; Ga. R. R. Co. v. Reeves, 64 Ga. 492, locating depot on strip of land; Ill. Midland R. R. Co. v. People, 84 Ill. 426.

A contract for a perpetual lease, or a lease in perpetuity, is valid. Todhunter v. D. M. I. & M. R. R., 58 Iowa, 205; White v. Fuller, 38 Vt. 193; Lampson v. New Haven, 2 Vt. 19; Iggulden v. May, 9 Ves. 324; Willan v. Willan, 19 Ves. 72; 1 Platt on Leases, 706.

Actual appropriation will aid an uncertainty. Ga. R. R. Co. v. Hart, 60 Ga. 550.

Possession under a contract which provides for a lease or conveyance, is a sufficient defense in ejectment. Holley v. Young, 66 Maine, 520; Kirby v. W., St. L. & P. R. W. Co., 109 Ill. 412; Turpin v. B. & O. & C. R. R., 105 Ill. 11.

MORAN, J. The first term of five years mentioned in the lease under which appellee went into possession of the freight station grounds here in controversy having expired, appellee was holding over under circumstances that created a tenancy from year to year and appellant is entitled to recover posses-

sion, unless by a compliance with the terms of the lease, and of the contract of the same date between the parties, to which the lease refers, appellee has earned the right to continue in possession until such time as appellant shall deliver possession of other freight station grounds to be held in perpetuity by appellee. It is agreed in the lease, that if the second party elects to lease freight station grounds in perpetuity of the first party, as specified in the articles of agreement, and shall give notice as therein provided, then the lease is to be extended for a further term, or a lease of other suitable freight ground furnished until the first party delivers to the second party possession of the ground so leased in perpetuity, or is prevented from so doing as specified in said agreement. By the articles of agreement appellee is given the right to run its cars, etc., in perpetuity, if within the five years it shall so elect, "and shall also elect to lease the freight station grounds hereinafter named of the first party in perpetuity, and shall notify said party of the first part of such election in writing."

Looking through the contract for a clause which names any grounds to be leased for freight grounds, we find this: "Should the second party elect to lease permanent freight grounds upon the lake front, the first party agree to enclose and fill the same ready for occupancy to an extent and in a manner to be agreed upon between the parties." And in another part of the contract this: "If the second party elects to lease the above named freight grounds *on the lake front* in perpetuity, then the party of the first part will furnish it a site for an engine house of ten stalls for the same time upon equitable terms."

The evidence showed that the term "lake front" had by popular usage a definite meaning and was applied to distinguish that portion of the lake shore lying between Randolph Street on the north and Park Row on the south. And it appears from the record that it was the intention of the Illinois Central Company to fill up the submerged land along this front and use it for railroad purposes. It is made plain by other references in the contract that the land to be leased in perpetuity on the lake front was land that would have to be

filled to be made ready for occupancy, and that the enclosing and filling thereof might be prevented by legal proceedings, and delay in procuring the legal title to the property was in the contemplation of the parties, and if such prevention or delay occurred, the lease was to be extended for another term of five years or for such portion thereof as might be necessary to enable the Illinois Central Company to obtain legal title and enclose and fill the ground. It was also present to the minds of the contracting parties that the Illinois Central Company might fail to secure the legal title to the land to be leased in perpetuity, and that, even if the legal title should be obtained and the land filled and enclosed for occupancy, yet the Baltimore Company might be unable to obtain convenient or proper access to said permanent freight grounds, and in the latter event, or if the legal title should not be obtained before three years from November 1, 1879, then the Baltimore Company should have the right to select other freight grounds not owned or claimed by the Illinois Central Company.

We are compelled by the terms of the contract and the evidence in the record to hold that the grounds upon which the Baltimore Company had the right to elect to lease in perpetuity permanent freight grounds, were the submerged lands claimed by the Illinois Company upon the lake front, that is, lands between Randolph Street on the north and Park Row on the south, and which was at the time of the making of the lease and contract, unfilled and unenclosed.

Was the notice or letter of October 23, 1879, which was sent by the general manager of the Baltimore Company to the president of the Illinois Central Company, an exercise of the right of election to lease freight station grounds in perpetuity under the term of the contract which bound the Illinois Central Company to enclose and fill and deliver to the Baltimore Company permanent freight station grounds upon the land covered by the contract, or to excuse itself from so doing by proving that it was prevented by legal proceedings from enclosing and filling such land, or that it was unable to secure the legal title thereto?

If said notice was not effective to put the Illinois Central

Company to these alternatives it was manifestly not a good election to lease freight station grounds in perpetuity, under the provision of the written lease and contract of July 27, 1874.

We find from the evidence that in the fall of 1879, shortly before the expiration of the time for giving notice of the election to run its cars and lease freight grounds in perpetuity, Mr. Keyser, representing the Baltimore Company, came to Chicago to look into the subject of permanent depot ground. Mr. Hudson, who was also an officer of the Baltimore Company, living in Chicago, had been, prior to the coming of Mr. Keyser, in conference with officers of the Illinois Central Company upon the subject of freight depot grounds, and a certain piece of ground north of Randolph Street had been offered by the Illinois Central officials and informally fixed upon as ground which could be furnished to the Baltimore Company for a permanent freight station.

When Mr. Keyser came he went with Mr. Hudson and certain officers of the Illinois Central Company to view this piece of ground. During the conversation he stated to the Illinois Central officials that the Baltimore Company had determined to avail itself of its option to take freight ground in perpetuity and according to the testimony of Mr. Jeffery, superintendent of the Illinois Central, reference was made to the ground which the Baltimore Company was entitled to expect under the terms of the original lease, and it was stated that the Illinois Central Company could not furnish ground south of Randolph Street owing to the legal difficulties and complications, but at some future time it might be done, and that the ground given north of Randolph Street, in lieu of that which was then occupied by the Baltimore Company would be subject to vacation by them at some future time when other ground south of Randolph Street could be furnished, if such time should arrive.

While no detailed explanation why ground south of Randolph Street could not be furnished was made in presence of witness, it seemed to be well understood by all parties participating in the conversation.

Mr. Keyser examined the proposed new grounds carefully, a tracing of them was furnished him by the Illinois Central Company, the size and shape and facilities of approach to the ground was fully discussed and examined, and it was concluded by Mr. Keyser that it was a desirable location for a permanent freight yard for his company.

The rent of the new grounds was agreed upon between the representatives of the two companies and $24,000 per year was fixed as the sum that should be paid.

The notice of election to lease the freight station grounds in perpetuity, which was afterward served upon the Illinois Central Company, was accompanied by a draft of lease containing a description of the new freight lot north of Randolph Street, which description had been furnished by the engineer of the Illinois Central to the Baltimore Company. We find in the record no evidence that any attempt was ever made to locate freight station grounds upon the land designated as "lake front" in the contract, nor of any examination of such land for the purpose of locating such grounds, nor of any discussion with reference to filling or inclosing said grounds by the officers of the companies, nor in the long correspondence that followed the giving of the notice of election do we find a hint that it was at all contemplated that it was the duty of the Illinois Central Company to proceed to enclose and fill freight station grounds for the Baltimore Company upon the lake front. The notice of election was not intended by the Baltimore Company nor understood by the Illinois Central Company to have reference to land described by the terms of the lease and contract of July, 1874.

The Baltimore Company must be held to know the location and limits of the land designated as "lake front" in the contract to which it was a party. The description accompanying their election to take in perpetuity, applies only to land which is outside of the territory within which, by the terms of the writing, they were entitled to exercise their election.

The notice can not be construed to be anything other than what the parties giving and receiving it understood it to be, and considering it in the light of the acts occurring prior and

subsequent to the service of it and in connection with the draft of lease of the freight station grounds which accompanied it, it is manifest that it was not an election to lease freight station grounds upon the submerged lands which the Illinois Central Company claimed upon the lake front, and which the latter company would, under the terms of the contract, be obliged to enclose and fill unless prevented by legal proceedings or a failure to secure legal title, but was an election to lease freight station grounds upon lands outside the territory mentioned in the contract, which lands had been filled and reclaimed long before July, 1874, and as to the title and possession of which there was not and is not any controversy.

If, then, the appellee did not elect to lease freight station grounds, which, by the written contract, the Illinois Central Company was to fill and enclose ready for occupancy, the inquiry as to whether the latter company have so filled and enclosed and delivered such grounds, and whether it was prevented by legal or other proceedings from so doing, becomes wholly immaterial. That company could not be required to do, nor to furnish an excuse for not doing, that which, by the election made by the Baltimore Company, it was wholly unnecessary for it to do or to attempt. Therefore we may dismiss that point of the controversy from further consideration.

It is contended that the lease and contract of July, 1874, was by the mutual agreement, the joint action of the parties thereto, modified so as to extend its terms to embrace the new freight grounds north of Randolph Street.

It is said that the parties could agree to substitute other grounds for those originally intended in the contract, and that such a substitution of grounds would be binding upon the parties as fully as though they were embraced in the description of grounds in the original contract. It may be true, as contended by counsel, that after a contract has been reduced to writing it is competent for the parties, by a subsequent verbal agreement, to add to, or subtract from, or to vary or qualify its terms, or to amend it and make a new contract, but this rule does not apply where the written contract is under

seal. Here the lease and contract of July, 1874, are each under seal, and the clauses of each of those instruments which have reference to the subject-matter under consideration must be treated as if found in one sealed instrument.

The description in these sealed writings of the land upon which appellee was given the right to elect to lease freight grounds in perpetuity, could not be changed by parol agreement or understanding between the parties, so as that upon the change an action or defense could be predicated at law. By the instrument the right of election being confined to certain definite territory, it could not be altered (at law) by parol so as to extend the right of election to other and different territory.

This is the well settled rule in this State, whatever departures may have been taken in other jurisdictions.

In Loach v. Farnum, 90 Ill. 368, this rule was applied to exclude from evidence a writing not under seal, but signed by the lessors, purporting to alter the monthly rent fixed by the lease under seal and upon which the suit was based; and in Hume v. Taylor, 63 Ill. 43, it was applied where a contract under seal was made to deliver 1,000 hogs of a certain weight and quality, and it was sought to show that the parties made a new parol contract by which it was agreed that a less number than 1,000 hogs would be received in full compliance with the original contract. In each case the parol contract modifying the sealed one was denied effect, upon the well settled rule of the common law that an executory contract under seal can not be modified or varied by a parol agreement.

Numerous other cases might be cited where the Supreme Court has applied the same rule, and we are not at liberty to apply a different one however respectable the authority which supports it.

It can not be contended that there ever was any such modification of the lease and contract of 1874, as was effective in law to extend its terms to the land selected as the permanent freight ground, north of Randolph Street. Therefore, appellant and appellee must stand in this suit as respects the rights of each, under said contract, as though there was no claim of

any agreement or understanding extending the option given, so as to include the land elected to be leased in perpetuity north of Randolph Street.

We conclude then that there was no election under the lease and contract to lease freight station grounds upon the lake front in perpetuity, and that there was no valid modification of the contract under seal by which its terms were extended so as to give the right of election upon lands north of Randolph Street, and it follows that under the strict terms of the contract and lease appellee had no right to retain the premises in suit after the expiration of the term limited in the lease of July 27, 1874. It is contended, however (and this is the main ground on which appellee's defense to this action is based), that appellant is estopped to deny that there was a valid election made by appellee to take freight station grounds in perpetuity under the contract. It is claimed by appellee that it is shown by the evidence that appellant induced by its conduct the election made by appellee upon the lands north of Randolph Street. That appellant offered those grounds to appellee as grounds embraced in the contract, and that before the expiration of the five years limited in the contract, appellee accepted those grounds in pursuance of the contract as being grounds embraced within it; that appellant knew that these grounds were so accepted by appellee, and that they had been mutually agreed upon; that the notice of election to run its cars and take freight station grounds in perpetuity, upon its face showed that it was given by appellee under the contract and for the purpose of securing rights, by exercising the option given by the contract; and that said notice was received by appellant together with the draft of lease describing the permanent freight grounds and leasing them in perpetuity, and the day before the expiration of the time for exercising the election under the contract, appellant's president admitted that he had received such notice of appellee's election to run its trains and occupy freight grounds in perpetuity and that it was all right, and that no objection was then made that appellee could not elect to lease said grounds in perpetuity under the contract. That having induced the selection of these

grounds and having acquiesced in the election to take them till after the time to make a different election under the contract had expired, appellant is now estopped by its conduct to deny that a valid election was made or that the grounds elected to be taken were embraced in the contract. The court below sustained this view and at the request of appellee held the following proposition: "If the written notice of election of October 23, 1879, contained a description of premises to be leased for permanent freight grounds that had previously been agreed upon by the parties, and was served prior to November 1, 1879, on the officers of the plaintiff, and no objection to such notice was made by the plaintiff or its officers, but the president of the plaintiff stated to the superintendent of defendant, who had served the notice, after the service thereof, on October 31, 1879, that he had received the said notice of the election of the Baltimore & Ohio & Chicago Railroad Company to run its trains and occupy the freight grounds in perpetuity, and that it was all right, then the plaintiff is precluded from making any objections to said notice of election or the form thereof, on the ground that said notice referred to grounds which are situate in part north of Randolph Street, or to grounds which are not upon the lake front, as claimed by plaintiff."

In the view we are compelled to take of this case, we do not deem it proper that we should express any opinion as to whether the allegations of appellee, as to appellants offering the land north of Randolph Street as land covered by the contract, and inducing its selection by appellee, and acquiescing without objection in the election made by appellee as being within the contract until after the period for exercising the option given had expired, are made out by the evidence, or whether, if made out, they constitute an estoppel *in pais* or equitable estoppel against appellant. And in anything said herein we are not to be understood as expressing or intimating any opinion in that regard. The question here is not whether an estoppel is made out, but whether such estoppel can be set up in this action to prevent appellant from recovering possession of land which, by the strict legal construction of the lease

and contract and in strict legal right, and save for the alleged estoppel, it is entitled to recover.

It is the settled rule in this State that estoppel *in pais* affecting permanent interests in lands can only be made available in a court of equity. Assuming the estoppel, is it here invoked in violation of this rule? Under the lease and contract this estoppel, if allowed here, converts a lease of the premises sought to be recovered, which by its own limitation expired at the end of a five years term, into a right in appellee to hold the premises for five years longer, and if appellant continues its failure or refusal to deliver the new freight lot elected to be leased, into a right to hold the premises in perpetuity, paying rent according to the terms of the written lease.

The equitable estoppel is then made as effective in this court of law to continue appellee in possession of the premises as if the estoppel was created by deed, or a formally executed and sealed lease for the additional term.

It can not be given this effect at law. Here we can not look to the equities of the parties but must enforce their strict legal rights. The legal rights of the parties as defined by the written lease and contract, and as affecting the lands therein described, may be here asserted, but any rights growing out of acts *in pais* which in equity would arrest the assertion of the legal right, must be presented in another form. In St. Louis Nat. Stock Yards v. Wiggins Ferry Co., 102 Ill. 514, an action of forcible entry and detainer, the Supreme Court have applied the rule that we are compelled to regard as decisive of the question in the case at bar. The court say: "We are aware of the fact that there is considerable conflict in the authorities upon this subject and that the tendency of modern decisions is to give effect to equitable estoppels affecting real estate in the legal forum as well as in courts of equity, yet it is believed the decided preponderance of authority is the other way, and it must be confessed that to allow such estoppels to avail in a court of law where ordinarily only legal title can be considered, is a wide departure from the fundamental principles which distinguish legal from equitable rights, and which require all permanent interests in land to pass by

some solemn formal mode of conveyance. But whatever the rule may be elsewhere, it is well settled by the repeated decisions of this court, that estoppels *in pais*, affecting permanent interests in land, can only be made available in a court of equity. There are cases in this State, some of them cited by counsel for appellee, where estoppel *in pais* has been interposed to prevent recovery of real estate in an action at law, but they are cases relating to boundaries, or to dedication of land to public use by plat, and sale of lots with reference to such plat, and seem to be exceptions to and not contradictory of the rule laid down in the St. Louis Stock Yards v. Wiggins Ferry Co., *supra*. It is suggested that the case last cited is to be distinguished from this, for the reason that there, the facts relied on as constituting the estoppel, that is, the permanent structures erected, were upon and had relation to the particular land, the possession of which was sought to be recovered; and here, the estoppel relates in fact to other land than that sought to be recovered, and is invoked to prevent the assertion that a contract was not complied with. We can not concur in this view. The lease terminated unless the condition contained in it was performed according to the terms of the contract. The right of possession of the premises sued for, and in certain contingencies a permanent interest therein, would be affected by the performance of the contract.

The contract was not performed, but it is said there are equitable reasons growing out of acts of the parties which shall affect the right of possession, or it may be the permanent interest in the land, as if the contract had been performed. The operation of the estoppel is to prevent the assertion of a right to the possession of the land which at law is clear. Hence, though there is a difference in the circumstances, the estoppel is invoked in each instance to accomplish the same result, *i. e.*, to defeat the legal right of possession. Appellee has a full and complete remedy if the equitable estoppel here set up in fact exists. A court of equity may compel an execution of the lease of the freight grounds, and may enjoin the further prosecution of this suit till the rights of the parties are fully settled in equity.

That tribunal is most appropriate, and is entirely adequate to the settlement of all the points of difference that exist between the parties as to the terms of the lease to be executed, if it shall be found that appellee is entitled to the main relief.

Other questions discussed by respective counsel do not, in the view we have taken, require consideration. The judgment must be reversed and the case remanded.

*Reversed and remanded.*